FILED
2017 Aug-31 PM 02:51
U.S. DISTRICT COURT
N.D. OF ALABAMA
Intern: Jacob Bassett
ALJ: Gloria W. Green

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| AMANDA GRACE ROPER, | ) | |
| | ) | |
| CLAIMANT, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:16-CV-00798-KOB |
| | ) | |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| RESPONDENT. | ) | |
| | ) | |

MEMORANDUM OPINION

I. INTRODUCTION

On June 26, 2013, the claimant, Amanda Grace Roper, protectively applied for disability and disability insurance benefits under Titles II and XVI of the Social Security Act. (R. 136, 138, 176). In both applications, the claimant alleged disability beginning on June 26, 2013, because of neck and back pain, nerve damage, irritable bowel syndrome, and depression. (R. 69). The Commissioner denied the claims on September 5, 2013. (R. 68). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on April 9, 2014. (R. 33).

In a decision dated October 2, 2014, the ALJ found the claimant was not disabled under the Social Security Act and thus not entitled to social security benefits. (R. 22). On March 14, 2016, the Appeals Council denied the claimant's request for review. (R. 1). The ALJ's decision thus became the final decision of the Commissioner. The claimant has exhausted her

administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner.

## II. ISSUE PRESENTED[1]

Whether the ALJ's decision to assign little weight to treating source Dr. Gerald M. Machen's medical assessment lacks substantial evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the

---

[1] Although the claimant raised several other issues, the court will only address this issue upon which it will reverse and remand the ALJ's opinion. Moreover, the court finds it unnecessary to address the claimant's sentence six motion to remand (doc. 18) given the court's reversal and remand.

Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[2]; 20 C.F.R. §§ 404.1520, 416.920.

Absent good cause, the ALJ must give "substantial or considerable weight" to a treating physician's opinion. *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1179 (11th Cir. 2011); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The ALJ must "clearly articulate" reasons for failing to give a treating physician substantial weight. *Philips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).

## V. FACTS

The claimant was thirty-two years old at the time of the ALJ's final decision (R. 30); had completed tenth grade (R. 42); had past relevant work as a stocker and cashier (R. 56); and alleges disability based on pain in the neck and back, nerve damage in the arms and legs, neuropathy, irritable bowel syndrome, and depression. (R. 43-45, 69).

*Physical and Mental Impairments*

The claimant presented to Cullman Primary Care Neurology on March 14, 2012 complaining of a one-and-a-half-month history of pain. She described the pain as primarily in her right shoulder, extending down the right arm to the hand with "numbness and tingling in all digits" that worsened at night waking her from sleep. Dr. Sheri Swader conducted electrophysiological testing that indicated the claimant had right C8 radiculopathy with evidence of chronic motor axonal loss and reinnervation; however, she had no irritation of the paraspinal

---

[2] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

4

muscle area and no clear indication of carpal tunnel syndrome, myopathy, or diffuse peripheral neuropathy. He further recommended imaging of the cervical spine. (R. 253).

Dr. Swader referred the claimant to Dr. Van Wadlington for radiology services. An MRI of the cervical spine on March 28, 2012 confirmed the diagnosis of cervical radiculopathy with minimal bulges in C4-7. (R. 252). A further MRI of the lumbar spine on May 8, 2012 by Dr. Wilton Holman III showed post-surgical changes [3] at L4-5 with a small central disc bulge but no evidence of nerve root compromise; a minimal broad-based disc bulge at L3-4 but no focus disc herniation or stenosis at any level; and mild facet degenerative changes at the lower three lumbar levels. (R. 251).

The record is silent on further treatment until December 18, 2012, when the claimant presented to Dr. Henry Beeler for treatment of her neck and back pain. Dr. Beeler reported that the claimant had a "reasonably good" range of motion in her right shoulder and neck. X-rays showed a dislocated clavicle on the right side and scoliosis in the thoracic spine. Dr. Beeler prescribed Tramadol for the claimant's pain and Relafen for her shoulder inflammation. (R. 263-64).

The claimant began seeing Dr. Gerald M. Machen as her primary physician on March 22, 2013 for back pain. (R. 248). The claimant followed up with Dr. Beeler on April 17, 2013; her previously prescribed medication was "helping her neck and control the pain quite well." (R. 263). A follow-up visit with Dr. Machen on April 22, 2013 to manage her medication showed that she was also prescribed Baclofen (muscle relaxant), Lortab (pain medication), and Neurontin (nerve pain medication). (R. 246). Dr. Machen renewed those prescriptions without changes at a

---

[3] The record contains no documentation of a prior surgery. However, Dr. Machen's note from the claimant's March 22, 2013 visit shows the claimant had lower back surgery in 2005. (R. 249). Dr. Harris reported at her August 31, 2013 examination that the 2005 surgery was for bulging discs. (R. 268).

5

follow-up visit on June 24, 2013, and the claimant also "brought [MRI] report[4]." (R. 244). The claimant returned to Dr. Beeler on July 2, 2013 for a burn, and while there Dr. Beeler refilled the claimant's prescription for Relafen and Tramadol. (R. 265-66).

The claimant completed a "Function Report-Adult" at the request of the Social Security Administration dated July 16, 2013. (R. 188). The claimant stated that she had a two-year-old son who she cares for with the assistance of her mother. The claimant further stated that she could not fulfill all of her daily functions, and her mother helped her with those as well. Specifically, the claimant stated she needed reminders to take baths and medicine; could not prepare food beyond sandwiches and microwave meals; had difficulty understanding and concentrating because of pain; and could not pick up anything weighing more than ten pounds. Additionally, the claimant reported being unable to sleep comfortably and waking up constantly from pain. (R. 182-86).

The claimant reported being able to fulfill some functions by herself. She stated she could pick up her own clothes; however, doing so took half the day because she had to sit down and rest because of her back. In explanation, the claimant stated she could not sit or stand "very long" without pain, could not sit and stand for long periods of time; and could walk only a half a block at one time, but required thirty minutes of rest before resuming walking. Further, the claimant stated she could go outside once a week; drive and ride in a car; shop for groceries twice per month for two hours; pay bills, count change, and use banking services; visit the doctor's office once per month; and read and watch television as daily hobbies, again limited by not being able to sit or stand for extended periods. (R. 182-86).

The claimant reported that her inability to perform the functions she was able to prior to the onset of her alleged condition caused depression and anxiety; that stress caused her

---

[4] The record does not indicate to which MRI report the notes from the June 24, 2013 visit with Dr. Machen refers.

6

nervousness, distress, and reclusion; that she did not handle changes in routine well; and that she was withdrawn and did not like crowds of people. (R.186-87).

The claimant's mother, Sosonja Whitley, also completed a "Function Report-Adult-Third Party" the same day. Ms. Whitley reported that the claimant's daily routine consisted of eating cereal and taking a bath, followed by reading and watching TV, with the limitation of being unable to sit or stand for long periods at a time. Further, Ms. Whitley stated that the claimant could not care for the claimant's two-year-old child by herself; and that Ms. Whitley helped generally in caring for the child, and specifically in bathing and lifting the child. Per Ms. Whitley, the claimant had no difficulty in personal care such as dressing, bathing, and feeding herself. The remainder of the facts reported by Ms. Whitley mirror those reported by the claimant practically verbatim. (R. 190-95).

On August 31, 2013, Dr. Annie Lee Harris, a diagnostic radiologist at Med-Plus, conducted a personal evaluation of the claimant's condition at the request of Disability Determination Services. The claimant reported a one-year history of pain, at an average level of 8/10 with pain medications. At the time, the claimant reported taking Tramadol, Lortab, and Neurontin for the pain, but stated that the effectiveness of the medications diminished over time. She further reported numbness and tingling in her arms and legs, as well as swelling in her ankles when standing for long periods. According to the claimant, she experienced constant pain in her right upper chest and right shoulder from a prior clavicle dislocation that healed improperly, with pain primarily at the sternoclavicular joint and worsening with pressure or palpitation in the area. (R. 268).

The claimant reported to Dr. Harris that she could stand for 30 minutes cumulatively over eight hours; was unsure how long she could walk or sit at one time; could lift about ten pounds;

7

and could sweep, mop, cook, clean dishes, and shop "in short intervals." Further, she stated she was unable to pick up her two-year-old son. (R. 268-69).

Dr. Harris evaluated several elements of the claimant's physical condition. First, Dr. Harris noted that the claimant could ambulate, get on and off the exam table, and get up and out of the chair without difficulty; had a normal gait without an assistive device; and could walk heel-to-toe, on toes, and on heels normally. Dr. Harris recorded that the claimant's shoulder forward elevation was 120 degrees bilaterally and abduction was 120 degrees bilaterally, and that all shoulder movements elicited pain although some range of motion was normal. The range of motion on the cervical spine was "normal but painful." The lumbar spine flexion was limited to 75 degrees, lateral flexion to 15 degrees bilaterally, and extension to 20 degrees, with all maneuvers eliciting pain. Hip flexion was limited to 85 degrees on the right and normal on the left. Internal rotation was limited to 25 degrees on the right and 30 on the left. External rotation was limited to 30 degrees bilaterally. Abduction was limited to 30 degrees. Extension was limited to 20 degrees. Dr. Harris stated that all maneuvers elicited pain. Further, the supine straight leg test was positive on the right at 45 degrees and 55 degrees on the left, while normal in the sitting position bilaterally. The claimant could also lay straight back on the table. (R. 270).

Dr. Harris also reported that the claimant was able to follow simple directions; her motor skills were "4/5" in the right lower extremity, "5/5" in the left lower extremity, and "5/5" in the upper extremities; and her grip strength was "5/5 on the right and 5/5 on the left," with normal sensation and no visualized atrophy. (R. 270.)

Dr. Harris's medical opinion was that the claimant had cervical and lumbar spine pain with nerve damage, citing demonstrated pain throughout the exam and radiating pain in the lower legs. Dr. Harris noted a limited range of motion in the legs, as well as "decreased strength

8

most notable throughout the right leg." Dr. Harris further stated "[h]istory of EMG and MRI [were] identifiable cause of pain." Further, Dr. Harris diagnosed the claimant with depression; noted she had a "flat effect" on exam and was tearful; and indicated she had insomnia secondary to pain and depression. (R. 270-271).

On September 5, 2013, the state agency psychiatric consultant, Dr. Samuel Williams, reviewed the claimant's cumulative records to that date for a psychiatric evaluation. (R. 78). To clarify the records of the claimant's alleged depression for Dr. Williams, the DDS Single Decision Maker (SDM), called the claimant. The claimant stated that her inability to physically work caused depression; that her pain caused her inability to concentrate, need to stay to herself, memory issues, and problems following directions; that her pain caused problems with her activities of daily living; and that she was otherwise fine and did not feel the need to see a mental health doctor. Dr. Williams stated that the psychiatric review showed no medically determinable mental impairment. (R. 71-73).

The claimant returned to Dr. Machen on December 4, 2013, for a follow-up visit regarding her disability paperwork. Dr. Machen listed radiculitis and adjustment disorder as additional active problems, and noted that the claimant was taking Celexa[5] (an antidepressant). (R. 291-93). The claimant returned to Dr. Machen's office on January 24, 2014 after suffering a fall. The claimant complained of back pain and further wanted to check on disability paperwork. Dr. Machen noted that the previous MRI performed did not show a surgical solution to the claimant's problems. He further noted that the claimant should be considered a candidate for nerve blocks and ordered an MRI. (R. 285-287). Dr. Wadlington performed an MRI on January 28, 2014, that showed a small disc bulge at L3-L4 and central and left-sided disc protrusions at L4-L5. (R. 294).

---

[5] The record does not indicate what physician prescribed Celexa.

On March 26, 2014, Dr. Machen completed a "Medical Assessment of Ability to Do Work Related Activities" at the request of the claimant's attorney.[6] Dr. Machen reported that the claimant could occasionally lift and carry up to ten pounds, and never more; that she could stand for up to two hours total during the day, and less than an hour at a time without interruption; that the claimant could sit for less than one hour at a time without interruption; and that she could not perform a job that involved walking during the workday because of her pain. Further, Dr. Machen stated that the claimant's use of her hands and feet were affected continuously and that she could never perform simple grasping in either hand; however, he indicated that the claimant could use her feet frequently. Dr. Machen reported that the claimant could never climb, balance, stoop, crouch, kneel, or crawl; reach occasionally; never handle; frequently feel; never push or pull; and hear and speak continuously. He stated that the claimant's condition imposed environmental restrictions on heights, moving machinery, chemicals, noise, dust, temperature extremes, fumes, and vibrations; however, he did not specify to what degree the restrictions would affect her ability to work or the degree of acceptable exposure. Dr. Machen did not specifically cite any medical findings or objective evidence to support his opinion in the assessment; in fact, although the assessment specifically provided spaces to provide supporting medical findings, Dr. Machen left those spaces blank. (R. 277-280).

On March 27, 2014, the claimant visited Dr. Machen to follow up on her disability paperwork and to review her medications. (R. 282-84). The claimant completed a "Claimant's Medications" form the next day for the Social Security Administration, listing her current

---

[6] This form uses an eight hour workday as the standard, and measures the claimant's ability to perform tasks based on a four point scale, as follows: "Never;" "Occasionally" (very little to one-third of the workday); "Frequently" (one-third to two-thirds); "Continuously" (more than two-thirds). The form uses checkboxes, with each set of checkboxes followed by a blank space for the physician to provide supporting medical findings. (R. 277).

medications as Baclofen for pain, Citalopram for pain and depression, Gabapentin for nerve damage, and hydrocodone for pain. (R. 241).

*The ALJ Hearing*

At the claimant's hearing before the ALJ on April 9, 2014, the claimant testified that her disability claim was based on her back pain and prior back operation, nerve damage and neuropathy in her arms and legs, and nerve damage in her arms that affected her ability to grip. (R. 43-44). She stated that at the time of the hearing, she lived with her mother and three-year-old son. (R. 43).

The claimant testified that she previously worked at Warehouse Discount Groceries as a stocker. The claimant stated that Warehouse Discount Groceries moved her from stocker to cashier because she could not lift heavy objects. She further stated that Warehouse Discount Groceries subsequently fired her because she could not grasp; would drop objects; could not move her arms "as desired"; and could not lift more than five pounds. (R. 44-45).

The claimant testified that the problems that led to her firing recurred in her daily life. She stated she could not pick up and grasp objects and consistently dropped objects when bringing them to her mouth at least two to three times per day. (R. 49). The claimant testified that she did not drop everything that she picked up, but sometimes dropped objects more than two to three times per day. (R. 62-63).

The claimant further testified that at the time of the hearing, her arms were "numb and tingly," and she also had lower back pain at that time rated at "about a nine." The ALJ asked the claimant if she was leaving and going to the emergency room because of the severity of the pain. The claimant stated that her pain was "maybe a six" on the pain scale and that the pain was constant. (R. 45-47). The claimant testified that she could sit half an hour at a time because of

her back pain. She further stated that she could stand for "maybe thirty minutes at the longest" and could walk for "maybe fifteen minutes." (R. 54-55).

The claimant testified that she usually wakes up around 9:30 AM each day, at which time she gets out of bed and rests on the couch while supervising her son. Because she is unable to lift her son, her uncle comes over and helps her take care of the child. (R. 47-48). The claimant asserted that she was depressed because she was unable to pick up and play with her son. She further stated that she plays with her son "sometimes," saying she could "play with him and talk to him, but that's about it." (R. 48).

The claimant stated that her depression made her not want to be around people; that people made her nervous; and that being around people made her very tired. Further, she stated that her depression made her lethargic; that she previously had friends that she saw regularly but did not see anymore; and that she suffered from panic attacks from her depression between one to three times per month. She clarified that her depression medication reduced the frequency of panic attacks to approximately once per month. The claimant testified that she did not go out to eat, go to church, meet friends, have a boyfriend, and rarely met with family. She stated that her family had not recommended mental health treatment. (R. 58-59).

The claimant testified that she did not cook, do household chores, or watch television. Further, she said that she only watched, not cared for, her son. She stated that she rarely listened to the radio. She testified that she drove infrequently for no longer than five to ten minutes. (R. 48-49). The claimant expressed that she shopped sometimes, but most of the time someone else did the shopping. When she did shop, she sometimes had difficulty lifting objects and only shopped by herself when she was not buying "a whole bunch of stuff." (R. 49).

The claimant testified that she took Norco (a form of Lortab) twice per day, Celexa twice per day, Neurontin three times per day, and Baclofen two times per day. She further stated each medication made her sleepy, and she had been taking the medications since 2012. (R. 51-52). The claimant stated that she takes naps every two hours each day, with each nap usually lasting an hour. (R. 66).

A vocational expert, Melissa Neal, testified regarding the type and availability of jobs the claimant was able to perform. Ms. Neal testified that the claimant's past relevant work was stocker, classified as medium and unskilled, and cashier checker, classified as light and semi-skilled. In the first hypothetical, the ALJ asked Ms. Neal to assume an individual of the same age and educational background as the claimant, with the same work history, with the residual functional capacity to perform a sedentary range of work. The hypothetical individual would be able to lift and carry ten pounds occasionally, stand and walk for two hours, and sit for six hours, with a sit-stand option on the half hour. The hypothetical individual would not be able to push or pull with the bilateral upper extremities or climb, could occasionally reach overhead with the bilateral upper extremities, could bend and twist at the waist occasionally, could handle frequently, and could feel and finger without limitations. The hypothetical individual would need work that only required occasional close interaction with coworkers or the public; that only occasionally demanded close supervision; that required normal concentration, persistence, and pace; that allowed work in two hour intervals for a cumulative eight hour day; and that required constant appropriate responses to "customary work changes or stressors." Ms. Neal testified that the hypothetical individual could not perform the claimant's past work, but could perform other sedentary, unskilled work, such as table worker, with 300 jobs locally and 14,000 nationally;

13

surveillance system monitor, with 200 jobs locally and 17,000 jobs nationally; and document preparer, with 300 jobs locally and 33,000 nationally. (R. 56-57, 60).

The ALJ then asked Ms. Neal to assume the limitations of the first hypothetical, with the added restriction that the hypothetical individual could lift and carry only five pounds. Ms. Neal stated that three of the jobs she identified would still be available, but the table worker would be reduced by half. In the next hypothetical, the ALJ added the restriction of being able to handle only occasionally rather than frequently, which Ms. Neal stated left only the surveillance system monitor job available. (R. 60-61). The ALJ further asked Ms. Neal if the same jobs would be available if the claimant needed two to three breaks of ten to fifteen minutes; Ms. Neal stated those jobs would not be available.

Finally, the claimant's attorney asked Ms. Neal to assume all of the previous hypotheticals, with the added restriction that the hypothetical individual would need one hour naps every two to three hours. Ms. Neal stated that no jobs would be available for that hypothetical individual. (R. 66).

*The ALJ's Decision*

On October 2, 2014, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 22). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2017, and had not engaged in substantial gainful activity from her alleged onset date of June 26, 2013. (R. 24).

Next, the ALJ found that the claimant had severe impairments of cervicalgia, fibrositis[7], neuropathy, cervical radiculitis, and adjustment disorder. The ALJ noted specifically that the claimant's cervicalgia, cervical radiculitis, and neuropathy caused functional limitations that allowed a range of sedentary work activity. The ALJ next found that the claimant did not have an

---
[7] Inflammation of fibrous connective tissue

14

impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 24-25).

The ALJ considered whether the claimant met the criteria for Listing 1.04, disorders of the spine. The ALJ concluded that the claimant had not demonstrated any of the specifically listed abnormalities and thus the claimant's degenerative disc disease did not meet the criteria for Listing 1.04. Next, the ALJ considered whether the claimant met the criteria for Listing 11.14, peripheral neuropathy, and determined that the claimant had not demonstrated disorganization of motor function in two extremities causing sustained disturbance of gross and dexterous movements, or gait and station, and, thus, did not meet the requirements for Listing 11.14. (R. 24-25). The ALJ next compared the effects of the claimant's mental impairment with the "paragraph B" criteria, and found that those effects did not rise to the level of "marked" as required by Paragraph B such that the claimant did not meet Listing 12.04. (R. 25-26).

The ALJ concluded that the claimant possessed the residual functional capacity (RFC) to perform sedentary work with both physical and mental limitations, to the extent that the claimant could occasionally lift ten pounds; could stand or walk for up to two hours of an eight-hour workday; could sit for six hours during an eight-hour workday with an option to sit or stand every half hour; could occasionally stoop, kneel, crouch, crawl, bend and twist at the waist, and reach overhead with the bilateral upper extremities; could frequently handle; could feel and finger without limitations; could never push or pull with the bilateral upper extremities, climb, or balance; could occasionally interact with coworkers and the public; could work in two hour intervals for an eight-hour workday; and could constantly respond appropriately to work changes and stressors. (R. 26-27).

The ALJ considered the claimant's symptoms and relevant medical record in making the RFC determination. The ALJ found that, although the claimant's impairments could be reasonable expected to cause the symptoms alleged, the claimant's statements regarding the intensity, persistence, and limiting effects of the alleged symptoms were not entirely credible. The ALJ determined the claimant's statements to be less credible specifically because of inconsistency with the objective medical evidence, the claimant's activities of daily living, and the claimant's course of treatment. The ALJ pointed specifically to the claimant's ability to stand and walk with normal gait and only slightly reduced range of motion despite stating her ability to walk was limited; her testimony that she did not cook or clean house despite her report to Dr. Harris that she could sweep, mop, cook, wash dishes, and shop; her conservative and routine treatment with no recommendations for surgery; her lack of complaints or report of symptoms outside early 2014; and her repeatedly asking Dr. Machen about disability papers. Furthermore, the ALJ noted that, although the claimant obtained treatment because of the alleged impairments, the record as a whole does not fully substantiate her assertions. Consequently, the ALJ found the claimant's back and nerve pain not disabling. (R. 29-30).

The ALJ gave great weight to the finding of the consulting physician, Dr. Harris, as her findings were based upon an examination of the claimant and consistent with the medical evidence of record. The ALJ gave limited weight to state agency psychiatric consultant, Dr. Williams, as the ALJ noted additional evidence was received after the state agency determination that suggested greater limitations than Dr. Williams documented; however, the ALJ did not specify what additional evidence was in question. (R. 29).

The ALJ gave little weight to the assessment of the claimant's treating physician, Dr. Machen. The ALJ noted that Dr. Machen indicated his restrictions on the claimant's ability to do

work-related activities would render the claimant totally disabled if taken literally. Further, the ALJ found that Dr. Machen's medical opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques. The ALJ determined that Dr. Machen failed to provide clinical data or information to support his opinion; additionally, Dr. Machen's opinion contradicted that of Dr. Harris. (R. 29-30).

Next, the ALJ, relying on the testimony of the vocational expert, found that the claimant is unable to perform any of her past relevant work. The ALJ determined that, based on the claimant's age, education, work experience, and residual functional capacity, the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the testimony of the vocational expert, that jobs exist in significant numbers that the claimant can perform. The ALJ determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. Accordingly, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 30-31).

*The Appeals Council Decision*

On November 14, 2014, the claimant submitted a request for an Appeals Council review, attaching evidence from Dr. Machen. (R. 4, 9). The evidence submitted from Dr. Machen consisted of a seven-line statement explaining that Dr. Machen had seen the claimant from March 2013 for fibrositis signs and symptoms; that her condition would make it difficult to perform any physical activity for more than an hour; that, as with many patients with inflammatory disorders, her degree of pain increases linearly with the time spent performing repetitive activity; that her fibrositis symptoms justified Dr. Machen's previous assessment suggesting no handling, pushing or pulling; that the claimant was continuing treatment with

adjustments to medication; and that Dr. Machen did not believe she could perform at pace to sustain gainful employment. (R. 295).

On March 14, 2016, the Appeals Council denied the claimant's request for review. Although the Appeals Council reviewed the additional evidence and incorporated it into the administrative record, the Appeals Council stated that Dr. Machen's statement did not provide a basis for changing the ALJ's decision because it was not contrary to the weight of evidence of record. (R. 1-2).

## VI. DISCUSSION

*Weight given to Dr. Machen's opinion by the ALJ*

The claimant argues that the ALJ erred in giving little weight to the claimant's treating physician Dr. Machen because the ALJ's finding lacks substantial evidence. This court agrees and finds that substantial evidence does not support the ALJ discrediting Dr. Machen's opinion.

The ALJ must give "substantial or considerable weight" to the opinion of a treating physician absent showing good cause to the contrary. *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1179 (11th Cir. 2011); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause exists when the evidence does not bolster a treating physician's opinion; the evidence supports a finding to the contrary; or when the treating physician's opinion is conclusory or inconsistent with the physician's own records. *Winschel*, 631 F.3d at 1179 (citation omitted). The ALJ must "clearly articulate" reasons for discounting the opinion of the treating physician. *Philips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). If substantial evidence does not support the ALJ's specific reasons for discounting the opinion of the treating physician, the ALJ commits reversible error. *See Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

The ALJ clearly articulated reasons for discounting the opinion of Dr. Machen. However, substantial evidence does not support the ALJ's reasons for affording little weight to Dr. Machen's opinion, especially when the opinion of the Commissioner's consulting examiner Dr. Harris lends support for both Dr. Machen's opinion and the claimant's allegations of disabling pain.

The ALJ stated that Dr. Machen's opinion lacks supporting clinical or diagnostic evidence based on the fact that Dr. Machen "failed to provide clinical data or information to support his opinion" on the form itself. (R. 30). Although the court agrees that Dr. Machen did not specifically indicate the objective medical evidence on the form, that fact alone does not mean that objective evidence in the record does not support the treating physician Dr. Machen's assessment of limitations based on the claimant's back pain. In fact, Dr. Harris found in 2013 that the claimant's "history of EMG and MRI [were] identifiable cause of [her] pain." Moreover, the claimant's 2014 MRI showed a disc bulge at L3-L4 and central and left-sided disc protrusions at L4-L5, providing more objective support for Dr. Machen's assessment as the claimant's treating physician and for Dr. Harris's previous assessment regarding the source of the claimant's severe pain.

The ALJ also stated, as a reason for discrediting Dr. Machen's assessment, the fact that his assessment *contradicted* Dr. Harris's opinion. However, after reviewing both assessments, the court finds that Dr. Harris's report in many respects *supports* Dr. Machen's assessment, specifically Dr. Harris found that all maneuvers of the claimant's shoulders and lumbar spine were limited and elicited pain. The facts that the claimant had a normal gait and walked without an assistive device did not negate Dr. Harris's assessment that the claimant had cervical and lumbar spine pain with nerve damage or demonstrated pain throughout the examination.

19

Although some of their limitations differed, Dr. Machen, as the treating physician, was in a better position to give his opinion about the claimant's specific limitations based on her demonstrated pain because of his years of treatment.

The court finds that substantial evidence did not support the weight the ALJ gave to the claimant's treating physician Dr. Machen.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the substantial evidence does not support the ALJ's decision to give Dr. Machen's assessment little weight. Accordingly, this court REVERSES and REMANDS the decision of the Commissioner.

The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 31st day of August, 2017.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE